No. 11,598.

BIGLER v. CROY, ET AL.

Decided May 16, 1927.

Action for real estate broker's commission. Judgment for plaintiff.

*Affirmed.*

1. APPEAL AND ERROR—*Fact Findings.* Where the evidence is in conflict, the Supreme Court accepts the findings of the trial court on review.

2. BROKERS—*Real Estate—Commission.* Evidence reviewed and held to support a finding that an exchange of property was procured through plaintiff's efforts as a broker.

*Error to the District Court of the City and County of Denver, Hon. Henley A. Calvert, Judge.*

Messrs. ROBINSON & SARCHET, Mr. JAMES E. GARRIGUES, Mr. W. DAVID McCLAIN, for plaintiff in error.

Mr. PERRY BEHYMER, for defendants in error.

*Department Two.*

MR. JUSTICE BUTLER delivered the opinion of the court.

DEFENDANT in error S. D. Croy sued the plaintiff in error for a commission and obtained judgment. Bigler, the plaintiff in error, seeks a reversal of the judgment. The trial was to the court, without a jury. The court found the issues generally for Croy, and also made the following findings:

"* * * that the said Bigler agreed to pay the said S. D. Croy for his services as a real estate broker in procuring a person, one O'Farrell, to exchange City

property in Denver, Colorado, for a ranch owned by the said Bigler in La Plata County, in Colorado, which exchange was consummated through the efforts and agency of the said Croy as broker, the amount so agreed to be paid was $773.00, and that it was agreed by the said Croy and the said Bigler that $273 of said $773.00 should be and was paid by a plumbing bill which the said Croy owed the said Bigler, leaving a balance of principal of $500.00 on said commission unpaid.''

Was there sufficient evidence to support the findings and the judgment entered thereon? Bigler contends that there was not; Croy contends that there was. On direct examination, Croy testified that he owed Bigler a plumbing bill; that Bigler came to collect the bill, and that upon that occasion Bigler said that he wanted Croy to sell or trade the former's ranch near Durango, and would give him $500 and the plumbing bill if he would find a buyer or a trade, and said that if Croy would do so, he (Bigler) would do the rest. Croy testified that he said he would try, if Bigler would give him some of his listings (typewritten circulars describing the property); that Bigler thereupon gave him a number of them; that he (Croy) went to see several real estate firms, gave them copies of the listing, and asked them to help work up a trade for him; that he gave a listing to Jones, a salesman for the Walker Investment Co., and introduced Bigler to Jones; that Bigler and he (Croy) looked at the O'Farrell property on Race street, and Bigler said he would trade for that; that Bigler came over, ''and we got them together,'' and they did the trading; that Bigler and O'Farrell met at the office of the Walker Investment Co. and entered into a contract to exchange properties; that he (Croy) was there when the trade was finished up; that he represented Bigler, and got the parties together; that he didn't do anything further, for he wasn't to have anything to do with the sale, but was only to get them together. Croy further testified that after the ''trade was put in writing'' Bigler told him he would

pay him his commission, but later refused to pay; that thereupon he (Croy) borrowed "$90 of it from Jones, but promised to pay it back." On cross-examination, Croy testified that he was not a real estate broker; that he made no contract with the Walker Investment Co.; that he did not employ them as his agent, or at all; that he just gave them one of Bigler's circulars, and they were to hunt up a trade; that he did not agree to pay them anything or give them any commission; that he was there when they finished the trade on March 12th, and Bigler paid the Walker Investment Co. a commission; that his (Croy's) claim is based on his agreement with Bigler, and on calling Jones' attention to the property and giving him one of Bigler's circulars; that Jones said he could get a buyer; that he (Croy) bases no right upon a split commission with the Walker Investment Co. He also testified that when the deal was closed he spoke to Bigler about the commission; that Bigler and Jones were then talking about the commission; that Jones said, "Who is going to take care of the old man?" and that Bigler said, "I will take care of him."

Croy's wife testified that at their house she heard Bigler say: "I came to see if you can't sell my farm at Durango. If you will, I will give you $500 and the plumbing bill. You might as well earn it as anybody else;" and that Croy said: "All right; I will try to find someone."

Jones, the Walker Investment Company's salesman, testified that Croy first called his attention to the Bigler property by handing him one of Bigler's circulars; that someone—"don't just remember whether it was myself or Croy"—called up Bigler over the 'phone, and asked him to come to the office; that Bigler made several trips to the office; that he (Jones) had Bigler meet O'Farrell; that after they met, he (Jones) took charge of the negotiations; that Bigler was to pay the Walker Investment Co. a commission of $500; that he (Jones) was Bigler's agent and was working for him; that Bigler paid his

expenses on a trip to La Plata county to show the land to O'Farrell; that about ten days after Croy handed him (Jones) the Bigler circular, a preliminary agreement between Bigler and O'Farrell for the exchange of properties was drawn; that he (Jones) and Floyd were the actual persons of the Walker Investment Co. who closed the trade; that at the time of the exchange of properties nothing was said with reference to paying Croy a commission; that Croy was not there; that during the negotiations Bigler wanted him (Jones) to come down on the company's commission; that Jones told him he would not do so because he (Jones) had to take care of Croy—that "he is in on this too;" and that Bigler said: "I will give you $500 to make the trade, and you will not have to go to Durango and show the property. I will do that myself, and I will take care of old man Croy. The $500 will be yours." Jones also testified that there was an agreement between Croy and him for a split commission; that according to custom, it should have been split three ways; a third each to the Company, Jones and Croy; that Bigler knew nothing about this. He further testified that he was not acting as sub-agent or employee of Croy's, but for the Walker Investment Co.; that he paid $90 of his commission to Croy as a split commission, but that Croy was to pay it back when Bigler paid him.

Bigler, in his testimony, denied that he told Croy that if the latter found a purchaser he (Bigler) would pay him a commission of $773, or $500 and the plumbing bill. He testified that he gave Croy some of his circulars; that he (Bigler) gave them out promiscuously, and that he listed the property with numerous real estate brokers, a dozen or so, including the Walker Investment Co. He also said:

"The way I came to list the property with the Walker Investment Co., Jones called me up over the 'phone one day and said Croy had been talking to him about the property and asked me to come down to the office. At

this time I did not know that Croy had given one of my circulars to Jones. I went and he called my attention to the circular he said Croy had given him. I filled out a card and listed the property with them, in the regular way and he took my name and address and said he would let me know as soon as he got a prospect. I entered the property on their books at his request as being listed with them. I never gave anyone—anybody the exclusive right to handle the property.''

He further testified that the purchaser, O'Farrell, was procured by Jones; that the Walker Investment Co. represented him (Bigler), and not O'Farrell; that the deal was closed in that company's office; that Croy was not present at any time during the transacting of the business; that before the final contract was signed, O'Farrell, Jones and he (Bigler) went to La Plata County to see the property; that the final contract was made and the deal closed at his (Bigler's) house; that Croy was not present; that the first time he saw Jones, Jones told him that Croy had handed him (Jones) one of Bigler's circulars; that he (Bigler) never met Croy and O'Farrell together at any time; that after the deal was closed, having heard that Croy was demanding a part of the commission from the company, he (Bigler) asked Croy why he was hounding the Walker Investment Co. for a commission; and that Croy, after studying a while, said, ''Just leave that to me.'' On cross-examination, Bigler testified:

''I never listed my La Plata ranch with Croy for sale or trade. I did give him some of the circulars and he may have told the Walker Investment Co. that I had a ranch to sell or trade and gave them one of the circulars, at least Jones told me when he called me to the office that Croy gave him one of the circulars and that is the way he came to call me down to the office. That is the way the Walker Investment Co. learned that I was in the market for a trade. Croy never produced O'Farrell to me. It was the Walker Investment Co.

"Q. How did you come to meet up with the Walker Investment Co. in the first place? A. Why, Jones called me up and asked me to come to the office. He did not tell me Croy had listed my property with them. He said Croy had handed him one of my circulars. I knew nothing of O'Farrell at that time. This was long before I heard of O'Farrell. I think it is true that Croy was the first one to deliver my circular to the Walker Investment Co. but all I know about it is what Jones told me. It was some ten or twelve days after that before the Walker Investment Co. found or produced O'Farrell or I heard of him. Croy gave the Walker Investment Co. one of my circulars and on the strength of that, Jones called me up. * * * From what Jones said, I think it was the circular that Croy gave Jones that put the Walker Investment Co. in communication with me. I think the way they got in touch with me was by Croy giving Jones one of my circulars and telling him I had a ranch to trade or sell. * * *

"I took Croy home one day with some groceries I bought him and we passed by the Race Street property and looked at it in passing by in the car."

Bigler's wife testified that the O'Farrell deal was consummated at the house, and that Croy was not present.

Where the evidence is in conflict, we accept the findings of the trial court. In our opinion, there is sufficient evidence to justify the findings.

In *Minks v. Clark,* 70 Colo. 323, 201 Pac. 45, a broker was employed to find a purchaser for certain property, including three separate tracts of land. He procured, as a purchaser of the greater part of the property, one Myers. Myers, in his turn, procured a purchaser for the rest, a purchaser whom the broker never saw, and with whom he had no communication. This court held that the broker was the procuring cause of the sale of the entire property.

In *Satisfaction T. & I. Co. v. York,* 54 Colo. 566, 131 Pac. 444, Mrs. York employed Pysher as a broker to sell

some land., Julius Krogh, who was Pysher's neighbor, introduced to Pysher one Nelson. Pysher showed the land to Nelson and Krogh. Nelson did not buy. Afterward Krogh told Pysher that other friends of his were coming to look for land. Later Krogh's cousin, Peter Krogh, came. Julius Krogh told Pysher that he didn't know whether his cousin would purchase at that time, but "You might show us around; he might buy something if he could find a bargain." Pysher asked Julius Krogh to speak to his cousin about the York land, and arranged to take the two Kroghs to see the land the following morning. The Kroghs, however, went without Pysher, and, unknown to Pysher, Peter Krogh contracted to purchase the land from Mrs. York. Pysher had not met Peter Krogh. The trial court granted a nonsuit and dismissed the case, on the ground that Pysher was not the procuring cause of the sale. We reversed the judgment, holding that the question should have been submitted to the jury.

In *Lincoln v. McClatchie*, 36 Conn. 136 (cited with approval in the opinion in *Leonard v. Roberts*, 20 Colo. 88, 36 Pac. 880), the defendant listed his house with the plaintiff for sale, reserving the right, however, to sell the property himself. The plaintiff advertised houses for sale on the street where the house in question was situated. In response to the advertisement, Goodwin, who lived on that street and wished to find a house near by for a friend, called at the broker's office and learned that the defendant's house was for sale. He informed his friend, and the friend went direct to the defendant and bought the house. The purchaser had no personal intercourse or dealing with the plaintiff. The court held that the plaintiff was the procuring cause of the sale and was entitled to a commission.

In *Carter v. Webster*, 79 Ill. 435, the plaintiff, a broker, was employed to sell defendant's land. The plaintiff engaged another broker to secure a purchaser. The second broker induced a third broker to interest him-

self to find a buyer. The third broker mentioned to a Mr. Mears that the property was for sale; and through the information thus obtained a Mr. Mears, Sr., went directly to the defendant and bought the property of him. The court affirmed the judgment for the plaintiff.

In *Clarke v. People's Roller Mills Co.*, 206 Ky. 686, 268 S. W. 333, it was held (quoting from syllabus):

"Where broker introduced to owner a prospective purchaser, who in turn introduced his associate who was to join in purchase, and where associate procured third person to join him on prospective purchaser's withdrawal from transaction, broker as a matter of law was procuring cause of sale to associate and third person."

See also *Derrickson v. Quimby*, 43 N. J. L. 373.

In the present case, the defendant employed the plaintiff to find someone who would buy the defendant's ranch or trade for it. The plaintiff interested Jones, of the Walker Investment Co., to find such a person. It was directly and solely through the plaintiff's effort that the defendant was brought into communication with Jones and the Walker Investment Co., and the defendant knew this at the time he called at the company's office and listed the land. Jones brought the defendant and O'Farrell together, and an exchange was made. We do not feel warranted in interfering with the trial court's finding that the "exchange was consummated through the efforts and agency of said Croy as broker."

The judgment is affirmed.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE SHEAFOR, sitting for MR. JUSTICE CAMPBELL, and MR. JUSTICE WHITFORD, sitting for MR. JUSTICE ADAMS, concur.